UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| IRVING MATERIALS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:03-CV-361-SEB-JPG |
| | ) | |
| THE OHIO CASUALTY INSURANCE | ) | |
| COMPANY AND AMERICAN | ) | |
| NATIONAL INSURANCE COMPANY, | ) | |
| Defendants. | ) | |

**ENTRY DENYING IMI'S MOTION FOR SUMMARY JUDGMENT** [Dk. No. 321]

Before the Court is the motion for summary judgment filed by Plaintiff Irving

Materials, Inc. ("IMI") against the sole remaining Defendants, American National Fire

Insurance Company ("American National") and Ohio Casualty Insurance Company

("Ohio Casualty"),[1] pursuant to Rules 16 and 56 of the Federal Rules of Civil Procedure

and this court's inherent authority to approve and enforce settlement agreements.[2] [See

---

[1]  The Defendants Ohio Casualty and American National jointly filed their briefings in support of their motions discussed in this entry, typically referring to Defendants collectively as "Ohio Casualty."  For clarity, we will refer to each party by name or collectively as Defendants, because particular facts apply exclusively to Ohio Casualty or to American National.

[2]  Also addressed in this entry are motions related to the Motion for Summary Judgment, specifically, Defendants' Motion for Continuance of Summary Judgment Briefing pursuant to Rule 56(f) is <u>DENIED</u> [see Docket No. 340]; Defendants' Motion for Leave to File Third-Party Complaint for Indemnity or Contribution Against Northern Insurance Company, New Hampshire Insurance Company, Indemnity Insurance Company of North America, Travelers Property Casualty Company of America, Gulf Insurance Company, American Guarantee & Liability Insurance Company and National Surety Corporation is <u>DENIED</u> [see Docket No.

(continued...)

Docket No. 321.]  IMI initiated this action against its insurers in an effort to obtain a

judgment declaring that Ohio Casualty and American National are obligated to defend

and indemnify it against numerous underlying claims alleging that IMI's deficient or

defective concrete caused property damage.  See IMI's Motion for Summ. J. at 1 [Docket

No. 321]; IMI's Memo in Supp. at 5.

<u>Background Facts</u>

IMI supplies ready-mixed concrete to contractors (or subcontractors) for various

uses at job sites, pursuant to the contractors' contracts with the building or site owners.

[Docket No. 328, at 16; Docket No. 329, Swaidner Dep. pp. 48, 66, 206.]  As part of its

operations, IMI purchases coarse aggregate from quarries to incorporate into its various

cement mixes.  Between September 1997 and March 2000, IMI purchased coarse

aggregate from Hanson Aggregates Midwest, Inc. and/or its related business entities

("Hanson") for incorporation into IMI's concrete mixes.  Defs.' Resp. at 5.  Beginning in

2002, IMI began receiving numerous reports that concrete containing coarse aggregate

from Hanson's quarry in Princeton, Kentucky was experiencing excessive expansion and

had evidenced signs of a condition referred to as "map cracking."  These conditions are

alleged to have resulted in IMI's concrete causing damage to property in and around

---

[2](...continued)
426]; Defendants' Motion for Leave to File an Amended Cross-Claim for Indemnity or
Contribution, and for Bad Faith, Against Defendant Zurich American Insurance Company is
<u>DENIED</u> [see Docket No. 427]; and regarding IMI's Motion to Strike or, in the Alternative,
Motion for Leave to File Reply, we <u>DENY</u> the motion to strike, and <u>GRANT</u> the motion to file
reply [see Docket No. 481].

Madisonville, Kentucky.  IMI's Memo in Supp. at 4.  IMI asserts that these problems were the result of Hanson's delivery to IMI of coarse aggregate that was unfit for use in ready-mix concrete and, in certain cases, due to the fault of other contractors who performed work at the subject job sites.  After learning of the defective concrete, the property damage it was creating, and its alleged cause, IMI initiated an action (separate from this cause) against Hanson and its affiliates in the Hopkins Circuit Court in Madisonville, Kentucky.  IMI's Memo in Supp. at 5; citing <u>IMI South, LLC d/b/a Irving Materials v. Hanson Aggregates Midwest, Inc., et al.</u>, Civil Action No. 03-CI-00173 ("the <u>Hanson</u> Subrogation Action").

IMI provided notice to its insurers that it was facing multiple claims (in excess of 464 claims as of December 2004), all alleging that the distress and expansion of the concrete in question resulted in damage to the claimants' property, including consequential damages, because of which IMI requested that the insurers defend and indemnify it.  On February 13, 2003, following IMI's insurers' alleged refusal to defend or indemnify IMI, this action was commenced by IMI against Zurich, American National, Ohio Casualty, National Surety Corporation, and American Guarantee & Liability Insurance Company in the Hancock Circuit Court.  This action was subsequently removed to this court based on diversity jurisdiction.  <u>See</u> Docket No. 1 (Notice of Removal).  On November 18, 2003, the Complaint was amended to include five additional insurance companies, namely, Northern Insurance Company of New York ("Northern"), New Hampshire Insurance Company ("New Hampshire"), Travelers

Indemnity Company of Illinois ("Travelers"), Gulf Insurance Company ("Gulf"), and Indemnity Insurance Company of North America ("IINA") (collectively, "IMI's other insurers").  Amended Compl. at Docket No. 102; see also IMI's Memo in Supp. at 6. However, when IMI determined that the policies of several insurers were not involved, IMI voluntarily dismissed Travelers, Gulf, IINA, and National Surety without prejudice. IMI's Memo in Supp. at 7.  On September 16, 2004, IMI, Zurich, American Guarantee, and Northern (collectively "Zurich") entered into a confidential settlement agreement. However, Ohio Casualty and American National have refused to acknowledge and honor IMI's settlement with Zurich because, in short, the terms of the Zurich settlement agreement require Ohio Casualty and American National to pay to IMI an amount that exceeds what they believe they would be required to pay under the terms of their insurance policies and Indiana law.  Id.

By this motion for summary judgment, IMI seeks approval and enforcement of IMI's settlement agreement with Zurich as well as a ruling that American National and Ohio Casualty are also bound thereby.  Each party has advanced multiple issues[3]

---

[3]  Specifically, IMI asks the Court to declare that:

1.  The underlying claims against IMI at issue in this action result from a single occurrence;

2.  There is coverage in whole or in part for the underlying claims;

3.  The retained limit, or attachment point, of each of the Ohio Casualty and American National umbrella policies is $1 million;

4.  IMI's primary coverage for these losses was

(continued...)

4

[3](...continued)

        exhausted at least by September 21, 2004 when IMI incurred and paid liabilities in excess of $3 million;

5.      All covered losses in excess of this amount may be allocated to the policies of Ohio Casualty and/or American National under the "joint and several" allocation approach as set forth in the "*Dana II*" decision of the Indiana Supreme Court;

6.      American National and Ohio Casualty have forfeited their policy rights under the rule of implied waiver and equitable estoppel; and

7.      The Settlement Agreement between IMI and Zurich is reasonable and enforceable, and is not subject to collateral attack by Ohio Casualty or American National.

<u>See</u> IMI's Motion for Summ. J. at 2; IMI's Reply at 1.  In contrast, Ohio Casualty and American National layout the pending issues as follows:

1.      Whether the settlement agreement between IMI and Zurich can change the rights and obligations of the parties to the Ohio Casualty Insurance contracts.

2.      Whether Ohio Casualty's excess/umbrella liability coverage, if any, is applicable only to damages in excess of the underlying insurance that are attributable to collateral or consequential "property damage" actually sustained by third parties during the effective periods of the Ohio Casualty insurance contracts.

3.      Whether the underlying claims against IMI result from a single "occurrence" or multiple "occurrences" (if any).

4.      Whether there is any basis in law, or in fact, for application of the "all sums" rule.

5.      Whether there is any evidence in or provided with IMI's motion for summary judgment of exhaustion of the underlying insurance for the effective policy periods of the Ohio Casualty excess/umbrella insurance contracts.

6.      Whether Ohio Casualty waived or is estopped from asserting any policy defenses.

(continued...)

5

for the court to address and resolve in this single motion for summary judgment; however, our analysis has been limited only to the following: (1) whether Ohio Casualty's and American National's insurance policies provide coverage in whole or in part for the underlying claims; and (2) whether the "joint and several" allocation approach set forth by the Indiana Supreme Court in <u>Dana II</u>, and adopted in the Settlement Agreement, applies such that the entire amount of the covered loss that exceeds the underlying retained limit may be allocated for payment to Ohio Casualty's and American National's policies.

As explained below, we hold that IMI's settlement agreement with Zurich is reasonable, but that this agreement cannot be construed to unilaterally modify the terms of American National's and Ohio Casualty's insurance agreements with IMI.  Thus, IMI's Motion for Summary Judgment is <u>DENIED</u>.  However, Defendants are responsible for defending and indemnifying IMI against a portion of the underlying claims because American National's and Ohio Casualty's insurance policies provide coverage for those underlying claims and the joint and several allocation approach set forth in <u>Dana II</u> does not apply.

---

[3](...continued)

> 7.    Whether IMI's accusations of recalcitrance and abandonment being unfounded and based on mediation/settlement conduct and discussions, should be stricken from the record.

Defendants' Resp. at Docket No. 342 at viii.

6

Statement of Material Facts[4]

1.    The Relevant Policies

Zurich and its affiliate, Northern, provided primary liability insurance coverage for

IMI in the amounts of $1,000,000 for each "Occurrence" and up to $2,000,000 for

"General Aggregate and Products/Completed Operations Aggregate," for each of five (5)

consecutive policy years, commencing on September 1, 1997, and ending on September

1, 2002.[5]  The schedules for American National and Ohio Casualty's excess/umbrella

insurance contracts specify that, after the underlying primary insurance provided by either

Zurich or Northern is fully exhausted, coverage is then potentially triggered under the

excess/umbrella insurance contract for the Policy Period.[6]  Defs.' Motion for Leave to

---

[4]  Ohio Casualty's response includes numerous facts which, although interesting and undisputed, ultimately are not material to our analysis and thus are not included in this statement of material facts.  Defs.' Resp. at 5-11.

[5]  **Zurich** issued to IMI the following primary general liability policies: Policy No. GLO 2978439-00 for the Policy Period from September 1, 1999 through September 1, 2000; GLO 2978439-01 for the Policy Period from September 1, 2000 through September 1, 2001; and GLO 2978439-02 for the Policy Period from September 1, 2001, through September 1, 2002.  See Defs.' Motion for Leave to File Cross-Claim, Docket No. 427 at 2, (Policies appear as Exhs. 1-2 of IMI's Compl., Docket No. 1; "Zurich American Insurance Company's Answer and Affirmative Defenses to Irving Materials Inc.'s Complaint and Counterclaim" ("Zurich's Answer") ¶ 7 of the Counterclaim, p. 13, Docket No. 24).

Zurich's affiliate, **Northern Insurance Company of New York ("Northern")**, issued IMI a general liability insurance contract for the Policy Period from September 1, 1997, through September 1, 1998, Policy No. EPA31791941.  Defs.' Motion for Leave to File Cross-Claim, Docket No. 427 at 2.  Northern issued IMI a general liability insurance contract for the Policy Period from September 1, 1998, through September 1, 1999, Policy No. EPA31791941.  Id.

[6]  **American National** issued to IMI a commercial excess/umbrella policy for the
(continued...)

7

File Cross-Claim, Docket No. 427 at 3.  Zurich's affiliate, American Guarantee, provided

similar excess/umbrella coverage for the September 1, 2001 through September 1, 2002

policy year.[7]

2.    The Scope of the Insurance Policies' Coverage

Each of the Zurich policies contains the following language defining the scope of

coverage: "We will pay those sums that the insured becomes legally obligated to pay as

damages because of 'bodily injury' or 'property damage' to which this insurance

applies."  IMI's Comp. Ex. 1, p. 1 of "Commercial General Liability Coverage Form,"

Docket No. 1; Zurich's Answer at ¶ 13-14 of the Counterclaim, pp. 14-15, Docket No. 24.

---

[6](...continued)
period September 1, 1999 through September 1, 2000, Policy No. UMB 9-82-10-80-00
(the "American National Policy").  IMI's Compl., Ex. 4, Docket No. 1; Answer of
Defendant American National Fire Insurance Company ("American National's Answer")
¶ 13, p. 2, Docket No. 26.  This policy provides up to $35,000,000 of coverage for each
occurrence; and applies a $35,000,000 general aggregate and $35,000,000 products-
completed operations aggregate limit.  Defs.' Exh. B.

**Ohio Casualty** issued to IMI a commercial excess/umbrella policy for the Policy
Period from September 1, 2000 through September 1, 2001, Policy No. BX0 (01) 52 60
04 10 ("The Ohio Casualty Policy").  IMI's Compl., Ex. 5, Docket No. 1; Answer of
Defendant Ohio Casualty Insurance Company ("Ohio Casualty's Answer") ¶ 14, p. 2,
Docket No. 25. This policy provides up to $35,000,000 of coverage for each occurrence;
and applies a $35,000,000 general aggregate and $35,000,000 products-completed
operations aggregate limit.  Defs.' Exh. B.

[7]  Zurich's affiliate, **American Guarantee & Liability Insurance Company
("American Guarantee")**, issued IMI an excess/umbrella liability insurance contract, Policy
No. AUC 9301029 00, for the Policy Period from September 1, 2001, through September 1,
2002, at a coverage limit of $10,000,000.  See Defs.' Motion for Leave to File Cross-Claim,
Docket No. 427 at 3.

Both the American National and Ohio Casualty Policies provide coverage for liability arising from "occurrences," stating in relevant part:

## COMMERCIAL UMBRELLA COVERAGE FORM

*****

## INSURING AGREEMENTS

## I.    COVERAGE

We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.  The amount we will pay for damages is limited as described below in the **Insuring Agreement** Section.

## II.    LIMITS OF INSURANCE

* * * * *

### G.    Retained Limit

We will be liable only for that portion of damages, subject to the Each Occurrence limit stated in the Declarations, in excess of the "retained limit," which is the greater of:

1.    the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the "Insured" during the Policy period; or

2.    the amount stated in the Declarations as Self-Insured Retention as a result of any one "occurrence" not covered by the underlying

9

policies listed in the Schedule of Underlying Insurance nor by any other insurance providing coverage to the "Insured" during the Policy Period.

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

* * * * *

## V.   DEFINITIONS

* * * * *

J.     "Occurrence" means:

1.     as respects "bodily injury" or "property damage," an accident, including continuous or repeated exposure to substantially the same general harmful conditions[.]

* * * * *

M.     "Property damage" means:

1.     physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.     loss of use of tangible property that is not physically injured.  All such loss will be deemed to occur at the time of the "occurrence" that caused it.

Defs.' Resp. at 13-15; citing American National and Ohio Casualty Commercial

Umbrella Coverage Forms, Exh. B.  Per the Schedule of Underlying Insurance in both the

American National Policy and the Ohio Casualty Policy, Zurich's policy is the only

underlying insurance reflected.  Id.  These Zurich policies have a $1,000,000 per

10

occurrence limit and a $2,000,000 aggregate limit.  Id.

3.    Hanson Coarse Aggregate

IMI contends that all of the coarse aggregate that is the subject of the underlying

claims came from the same source, namely, Hanson's Princeton Quarry, located in

Princeton, Kentucky.  IMI's Undisputed Facts at 3 [Docket No. 329, Tab 2]; citing

Harmon Affidavit at ¶ 8; Swaidner Dep., at p. 15, lines 9-17.  From September 15, 1997,

through March 22, 2000, IMI purchased dump truck loads of coarse aggregate from

Hanson on an almost daily basis which were used as an ingredient in its ready-mix

concrete which was poured for use at numerous construction projects in and around the

Madisonville, Kentucky area.[8]  See Affidavit of Michael G. Harmon ("Harmon

Affidavit"), which is attached to IMI's Appendix of Materials in Support of IMI's Motion

for Summary Judgment at Docket Number 329 as Exhibit B, at ¶¶ 4-5; see also

Deposition of Kevin Swaidner ("Swaidner Dep."), attached as Exhibit C, p.11, lines 12-

17.  Between September 15, 1997, and March 22, 2000, Hanson was IMI's only supplier

---

[8]  Ohio Casualty states that "[c]ontrary to IMI's contention that all the size 57 coarse aggregate used by IMI from September 1997 through March 2000 came from Hanson's Princeton quarry (IMI Brief at 42), IMI's representatives testified that Hanson's Princeton quarry was not the only supplier of coarse aggregate during that period of time."  (Kevin Swaidner 07/14/04 Deposition at 83; and Kevin Swaidner 02/16-17/04 Deposition at 283 attached to App. as Exh. C.)  During this time period, IMI also purchased size 57 aggregate from Hanson's Marion quarry.  (Kevin Swaidner 07/14/04 Deposition at 169.)  In reply, IMI states that it "does not now contend – nor has it ever contended – that it obtained all size 57 coarse aggregate from Hanson's Princeton quarry."  IMI's Reply at 5.  Rather, all of the defective coarse aggregate came from Hanson's quarry in Princeton, Kentucky and not from any other source.  IMI does not dispute that it obtained coarse aggregate from the Marion quarry, but that aggregate has never been the subject of any of the underlying claims.  Id.

of coarse aggregate for the projects in and around the Madisonville, Kentucky area.

Harmon Affidavit at ¶ 6.

     4.     <u>Discovery of Concrete Expansion and "Map Cracking"</u>

In the Fall of 2001, IMI began receiving numerous reports that concrete, which IMI had supplied to certain customers located in and around Madisonville, Kentucky, was experiencing excessive expansion and was subject to a condition known as "map cracking" or alkali carbonate reactivity ("ACR").[9]  Swaidner Dep. at p. 211, lines 12-15; p. 214, lines 4-12; p. 80, lines 4-22.  IMI investigated and concluded in the Spring of 2002 that these incidents of expansion and cracking were caused by ACR in the coarse aggregate provided by Hanson's quarry in Princeton, Kentucky.  <u>Id.</u>; <u>see also</u> Affidavit of Michael A. Ozol, Ph.D., Docket No. 329, Exh. D; IMI Statement of Undisputed Facts at 4.

Ohio Casualty states that the defective condition, ACR, "does not exist in a number of projects that used IMI's concrete containing size 57 aggregate from the Princeton quarry from September 15, 1997, through March 22, 2000."  (Kevin Swaidner 7/14/04 Deposition at 20 and 85; Kevin Swaidner 2/16-17/04 Deposition at 20; and IMI's Answers to New Hampshire Insurance Company's First Set of Interrogatories at No. 3.)

_____

[9]  Ohio Casualty states that IMI received notice of the underlying claims at different times, beginning in late 2000 and continuing to the present.  Swaidner 7/14/04 Dep. at 100-02 and Exh. 3 thereto.  IMI disputes this sentence stating that Mr. Swaidner testified that IMI first received reports in the Fall of 2001 that concrete containing coarse aggregate from Hanson's Princeton Quarry was experiencing excessive expansion.  IMI's Reply at 12; citing Swaidner Dep. at 80, 211, and 214.

IMI states that this fact is immaterial to the present motion and can be explained because the reaction is a function of exposure to moisture, the percentage of the defective aggregate present, and other variables that are not present at every site. See Aff. of Ozol, Docket 329 at Tab 2.D ¶¶ 6-11. Ohio Casualty maintains that IMI has identified in excess of twenty properties where size 57 coarse aggregate from the Princeton quarry was used during the relevant time period, but where there are no visible signs of ACR. (Kevin Swaidner 7/14/04 Dep. at 203-204; and Kevin Swaidner 2/16-17/04 Deposition at 162-164.) IMI disputes this statement, stating that the testimony Ohio Casualty cites does not support these propositions. "Specifically, Mr. Swaidner actually testified that he was aware of no sites using size 57 coarse aggregate from Hanson's Princeton Quarry that did not result in ACR." IMI's Reply at 10; citing Feb. 16, 2004, Swaidner Dep. at pp. 162-64.

Defendants state that they do "not assume or stipulate that the coarse aggregate purchased by IMI from Hanson was inherently or necessarily defective, as stated in IMI's Brief." Defs.' Resp. at 5. However, in reply, IMI argues that Defendants' unsupported contention that they do not agree with IMI's factual assertion, without reference to any evidentiary materials, is insufficient as a matter of law to defeat summary judgment. IMI's Reply at 5; citing Anderson v. Liberty Lobby, 477 U.S. 242, 249-52 (1986). For purposes of this motion only, we assume that the problem or "defect" in IMI's concrete was a result of the defective coarse aggregate supplied to IMI by Hanson from Hanson's Princeton, Kentucky, quarry, which is a component of the concrete, because this is the

only conclusion supported by the record.[10]  [Docket No. 481 at 3; Docket No. 329, IMI's

Statement of Undisputed Facts ¶¶ 12, 29; Ozol and Simpson Gumpertz reports, Tab 2.D.]

The expert evidence IMI has designated includes an analysis of the various ingredients of

the concrete and the uncontroverted conclusion that the source of the problem was

Hanson's defective coarse aggregate, which triggered a chemical reaction known as alkali

carbonate reaction, "ACR."  Id.  Ohio Casualty has not designated any evidence, expert or

otherwise, to refute IMI's evidence in these respects.  A party's self-serving statements,

unsupported by specific facts reflected in the record, cannot preclude summary judgment.

See Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Slowiak v. Land

O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).  Consequently, we accept as proven

that the coarse aggregate purchased by IMI from Hanson was defective, which led to the

claims against IMI.

5.    IMI Notifies Its Insurers of Underlying Claims

        In a letter dated October 17, 2002, IMI's insurance agent, Tobias Insurance Group,

Inc. ("Tobias") notified Zurich on behalf of IMI of the underlying claims and requested

that Zurich immediately agree to defend and indemnify IMI.  This letter explained,

among other things, the underlying claims that were being asserted against IMI and how

IMI believed these problems were due to a certain Hanson product, namely, coarse

aggregate, supplied to IMI by Hanson.  IMI's Statement of Undisputed Facts at 4; citing

---

        [10]  We previously acknowledged that the Hanson Subrogation Action pending in Hopkins
Circuit Court in Madisonville, Kentucky, will address the issue of Hanson's liability to IMI.
However, for purposes of this motion, we rely only on the record created in the case here.

Gauss Aff. at Ex. 1.  On January 17, 2003, Tobias sent a similar letter to American National and Ohio Casualty also placing them on notice of the underlying claims and requesting that they defend and indemnify IMI.  IMI's Statement of Undisputed Facts at 4; citing Gauss Supp. Aff. at Tab 2E of Docket No. 329.

On or around May 2, 2003, lawyers for prospective claimants ran advertisements in newspapers and on the radio in the Madisonville, Kentucky, area inviting claimants to join in lawsuits against IMI.  IMI's Statement of Undisputed Facts at 5; citing Swaidner Aff. at ¶ 4.  IMI forwarded these advertisements to its insurers, including Zurich, American National, and Ohio Casualty, and renewed its request for defense and assistance with the underlying claims.  Id.; citing Swaidner Aff. at ¶ 5.

6.    Specific Underlying Suits

Each of the claimants in the underlying lawsuits alleged that the distress and expansion of the concrete in question resulted in damage to their property, including consequential damages.  IMI's Statement of Undisputed Facts at 7; citing Corbin Complaint, Docket No. 102, Exh. 24 at ¶¶ 18, 21, 24 and 29; Staton Complaint, Docket No. 102, Exh. 25, at ¶¶ 32, 36, 44, 51, 67 and 78; Lewis Complaint, Docket No. 102, Exh. 26 at ¶¶ 7-11, 28.  IMI's experts determined that the distress produced by the alkali carbonate reactivity in the coarse aggregate provided by Hanson's quarry in Princeton resulted in the property damage that had occurred and was continuing to occur during the September 1999 to September 2001 time period.  Ozol Aff. at ¶¶ 6-11.  This damage was not limited to the concrete itself but also resulted in shoving, buckling, or crushing of

15

adjacent materials, structures, and joints.  IMI's Statement of Undisputed Facts at 7;

citing Ozol Aff. at 6-11; Corbin Complaint, Docket No. 102, Exh. 24 at ¶¶ 18, 21, 24 and

29; Staton Complaint, Docket No. 102, Exh. 25, at ¶¶ 32, 36, 44, 51, 67 ant 78; Lewis

Complaint, Docket No. 102, Exh. 26 at ¶¶ 7-11, 28.  Before settling any of the underlying

claims or making any settlement payments to any of the claimants, IMI states that it

verified that a reaction was taking place in the concrete in question and that it was due to

defective or substandard coarse aggregate.  Swaidner Dep. at p. 122, line 5 through p.

124, line 22; Swaidner Aff. ¶ 8.  As of December 2004, IMI had received in excess of 464

claims from its customers and anticipates that additional claims may yet be asserted.

IMI's Statement of Undisputed Facts at 13; citing Swaidner Aff. at ¶ 6; Swaidner Dep. at

p. 135, lines 10-12.  Included within this number were numerous claims that resulted in

the filing of the Corbin, Stanton, and Lewis lawsuits.[11]  Id.

---

[11]      A.      Corbin v. IMI
    On May 2, 2003, Pam Corbin filed suit against IMI in Corbin v. IMI, in Hopkins
Circuit Court in Madisonville, Kentucky.  See Corbin Complaint attached to the
Amended Complaint as Exh. 24, Docket No. 102.  On May 7, 2003, Tobias sent a letter
requesting an immediate defense of IMI in the Corbin matter to IMI's insurers, including
Ohio Casualty and American National.  See Gauss Supp. Aff. at Ex. 2.
         B.      Andrew Staton et al. v. IMI, IMI South LLC, and Hanson
    On July 10, 2003, Andrew Staton and a group of claimants filed a putative class
action against IMI and Hanson in Hopkins Circuit Court in Madisonville, Kentucky,
entitled Andrew Staton et al. v. IMI, IMI South LLC, and Hanson.  See Amended
Complaint, Docket No. 102, Exh. 25.  This case sought certification of a class that would
include every claimant in the State of Kentucky who has or might have a claim against
IMI relating to or arising out of the coarse aggregate in question.  Id.; IMI's Statement of
Undisputed Facts at 6-7.  In a letter dated July 21, 2003, Tobias notified American
National and Ohio Casualty of the Stanton suit and again requested that they defend and
indemnify IMI fully.  See Gauss Supp. Affidavit at Ex. 6.

(continued...)

7.    Initiation of this Lawsuit

On February 13, 2003, this action was commenced by IMI against Zurich, American National, Ohio Casualty, National Surety Corporation, and American Guarantee & Liability Insurance Company in the Hancock Circuit Court.  See Docket No. 1 (Notice of Removal).  IMI's Complaint alleged that from mid-1998 to approximately 2000, it sold ready-mix concrete containing aggregate from Hanson Aggregates; that the concrete so supplied was used in construction projects causing damages; that unspecified IMI customers were asserting claims or lawsuits against IMI alleging its concrete is defective, had resulted in property damages, posed a risk of significant structural damage, and other consequential damages and significant bodily injuries; that IMI had recently incurred hundreds of thousands of dollars in costs, fees and expenses to investigate the underlying claims, make necessary repairs, and mitigate damages at numerous sites; that it had made demand upon Zurich to defend and indemnify IMI for these underlying claims; that it had also notified its excess and umbrella liability insurers of these underlying claims, including American National, Ohio Casualty, American Guarantee and National Surety; that none of IMI's insurers had agreed to defend or indemnify IMI in connection with the underlying claims; that Defendants have breached their contractual

---

[11](...continued)
            C.    Lewis v. IMI, IMI South, LLC
      On July 30, 2003, Jerry and Sherry Lewis filed an action against IMI in a case entitled Lewis v. IMI, IMI South, LLC, in the Hopkins Circuit Court in Madisonville, Kentucky.  See Lewis Complaint at Exhibit 26 of Docket No. 102.

obligations to IMI allegedly causing significant damages to it; and that it seeks judgment against Defendants for damages, including consequential and incidental damages, interest, attorneys' fees and litigation expenses, and a declaratory judgment that Defendants are obligated to indemnify IMI in connection with the underlying claims. Docket No. 1.

On May 15, 2003, Ohio Casualty and American National filed their Answers to IMI's Complaint, in which they denied any and all bases of liability and asserted over fifty (50) affirmative defenses.  See Docket No. 25 and Docket No. 26.  Neither Ohio Casualty nor American National filed a declaratory judgment action or provided any defense or indemnity to IMI.  IMI's Statement of Undisputed Facts at 5.

On October 14, 2003, IMI sought leave to file its Amended Complaint to add insurers that Ohio Casualty and American National had insisted must be part of the case, including New Hampshire Insurance Company ("New Hampshire").  See Docket No. 69; see also Consent to IMI's Filing of Amended Complaint, Docket No. 81, 102, 104-108. On January 7, 2004, American National and Ohio Casualty filed their Answers to IMI's Amended Complaint, in which they denied any basis of liability but again did not bring a declaratory judgment action against IMI, Zurich, New Hampshire, or any other party to the lawsuit.  Nor did Defendants assert cross claims against any of the newly-joined carriers.  See American National's Answer to Amended Complaint (Docket No. 137) and Ohio Casualty's Answer to Amended Complaint (Docket No. 138).

8.    IMI's Correspondence with Insurers

18

The record reflects numerous items of correspondence between the parties.  While each item is relevant to the extent that it reflects the parties' positions over time regarding Ohio Casualty and American National's duty to defend IMI in the underlying suits, the parties' positions are generally consistent; thus, we highlight only a few of their interactions.  In a letter dated June 5, 2003, IMI sent Ohio Casualty and American National a May 7, 2003, report which IMI had provided Zurich containing a status update, budget, and other information regarding the underlying matters and again requested that the insurers reconsider their refusal to participate in the defense and resolution of the underlying claims and the pursuit of IMI's claims against Hanson for the damages caused IMI as a result of Hanson's defective aggregate.  IMI's Statement of Undisputed Facts at 6; citing Gauss Supp. Aff. at Ex. 3.

By letter dated August 7, 2003, Zurich suggested that it would exhaust its policy limits once it paid $1 million to resolve claims and that it was "rapidly approaching" this limit.  See Gauss Supp. Aff. at Ex. 7.  On October 17, 2003, Tobias advised American National and Ohio Casualty that Zurich had, as of that date, not reimbursed IMI for any of its defense costs and had taken the position that coverage under Zurich's policies had been exhausted, urging these insurers to intervene to defend and indemnify IMI in Zurich's absence in all of the underlying matters.  IMI's Statement of Undisputed Facts at 9; citing Gauss Supp. Aff. at Exh. 8.

By letter dated October 21, 2003, American National and Ohio Casualty asserted that, as umbrella carriers, their respective obligations to defend and indemnify IMI had

19

not yet ripened.  <u>See</u> Gauss Supp. Aff. at Ex. 9.  American National and Ohio Casualty

further stated that they had "no evidence that Zurich has or will exhaust its underlying

limits of liability."  <u>Id.</u>  American National and Ohio Casualty expressed their intent to

"continue to investigate those claims under a full reservation of rights;" however, neither

stated that it denied coverage or agreed to defend subject to a reservation of rights.  <u>Id.</u>;

<u>See also</u> Gauss Supp. Aff. at Exh. 15 (similar letter).

Ohio Casualty representatives appeared for the Court-ordered mediation on

September 14, 2004, and were told by the mediator that their presence was not required

that afternoon and that they should return on September 15, 2004.  <u>Id.</u>  Ohio Casualty

representatives appeared for the Court-ordered mediation on September 15, 2004, and

were told that IMI and Zurich had concluded a settlement to which they would seek to

bind Ohio Casualty.  <u>Id.</u>  Thereafter, Ohio Casualty asserts that it continued to participate

in the mediation process in good faith, it was not "recalcitrant" and it did not "abandon"

IMI at any time.[12]  (Aff. of Joseph Snider.).

9.    <u>IMI's Losses</u>

As of September 9, 2003, IMI reports that it had incurred over $1,000,000 in losses

arising from claims for damages resulting from reactivity in Hanson's aggregate.  IMI's

Statement of Undisputed Facts at 8; citing Swaidner Dep. at p. 91, lines 6-25, Exh. 1.  As

---

[12]  IMI states that Ohio Casualty's argument that it was not "recalcitrant" and that it did not "abandon" IMI as supported by Joseph Snider's affidavit is not well-taken because that affidavit "contains nothing but unsupported conclusions and inadmissible evidence about the conduct of the Ohio Casualty during the parties' mediation in September 2004."  IMI's Reply at 5-6.

of January 22, 2004, IMI had incurred over $3,000,000 in losses arising from claims for damages resulting from reactivity in Hanson's aggregate.  IMI's Statement of Undisputed Facts at 11; citing Swaidner Dep. at p. 91, lines 6-25, Exh. 1.

By June 3, 2004, IMI had incurred over $5,000,000 in losses arising from claims for damages resulting from reactivity in Hanson's aggregate.  IMI's Statement of Undisputed Facts at 12; citing Swaidner Dep. at p. 91, lines 6-25, Exh. 1.  This figure is five times the per occurrence retained limit and more than double the aggregate retained limit which Zurich, IMI's primary insurer, is obligated to pay on any one policy in a given policy year.  Once the per occurrence retained limit ($1,000,000) or the aggregate retained limit ($2,000,000) is exhausted, the excess/umbrella insurance policies are typically obligated to provide coverage.  <u>See</u> American National Policy and Ohio Casualty Policy at Schedule of Underlying Insurance.

10.    <u>Zurich Payments to IMI</u>

As of September 21, 2004, the Zurich Defendants had made indemnity payments in excess of $3,000,000 to IMI in connection with the underlying claims, and by March 25, 2005, that amount had grown to $8,094,032.40.  <u>See</u> Affidavit of Janet R. Davis, Exh. G of Docket No. 329 at ¶ 4-5.  Zurich issued these payments to IMI in the ordinary course of the claims resolution process which IMI and Zurich implemented prior to their entering into the IMI/Zurich settlement agreement.  <u>Id.</u> at ¶¶ 4-5.

On October 1, 2004, the Zurich Defendants advised American National and Ohio Casualty that its indemnity payments had exhausted the policy limits of the Northern

21

Policy No. EPA 31791941 (with an effective policy period of 9/1/98 - 9/1/99) and Zurich American Policy No. GLO 2978493-00 (with an effective policy period of 9/1/99 - 9/1/00 - 9/1/01) as of September 21, 2004.  See Gauss Supp. Aff. at Ex. 17.  In his October 1, 2004, letter, Zurich's counsel advised American National and Ohio Casualty that, as a result of the exhaustion of the above listed primary policies, the defense obligation owed by the Zurich Defendants to IMI in connection with the underlying claims terminated as of September 21, 2004.  Id.

On October 5, 2004, IMI advised American National and Ohio Casualty that it agreed with the Zurich Defendants' assertion that, as of at least September 21, 2004, IMI's primary coverage had been exhausted.  IMI's Statement of Undisputed Facts at 15; citing Gauss Supp. Aff. at Ex. 18.  IMI again renewed its request in its October 5, 2004, letter that Ohio Casualty and American National immediately assume the defense of all of the underlying claims, agree to fully indemnify IMI in connection with the underlying claims, and agree to fund the investigation, adjustment, and settlement of the claims of prospective members of the Staton class action.  Id.

Not until October 21, 2004, did American National and Ohio Casualty assert for the first time that their obligation to defend IMI would not be triggered until IMI provided notice that Zurich had made indemnity payments in settlement of the Underlying Claims totaling $5,000,000.  See  Gauss Supp. Aff. at Ex. 19.  In the same letter, American National and Ohio Casualty reiterated a prior proposal to pay 40% of the future defense costs incurred by IMI in defending the Underlying Claims, but only after Zurich had paid

22

$5,000,000.  Id.  By letter dated November 1, 2004, IMI rejected American National and

Ohio Casualty's offer to pay 40% of the future litigation costs and renewed its request for

full umbrella coverage.  See Gauss Supp. Aff. at Ex. 20.

On November 15, 2004, American National and Ohio Casualty acknowledged

their obligations to defend and indemnify IMI but again renewed their proposal to provide

only limited coverage, i.e., 40% of IMI's future losses, and only then after Zurich had

paid $5,000,000 to resolve the underlying claims.  See Gauss Supp. Aff. at Ex. 21.

On December 29, 2004, Tobias sent voluminous claim forms and notices regarding

many new claimants to Ohio Casualty and American National, again urging American

National and Ohio Casualty to provide coverage for IMI's mounting losses.  Gauss Supp.

Aff. at Ex. 23.

On February 7, 2005, American National and Ohio Casualty requested

"verification" from Zurich that it had expended in excess of $5,000,000 in settlement of

the underlying claims.  IMI's Statement of Undisputed Facts at 16; citing Gauss Supp.

Aff. at Ex. 24.  By letter dated April 1, 2005, counsel for IMI expressed disagreement

with the positions taken by American National and Ohio Casualty that their obligations to

provide coverage were only triggered once Zurich had expended $5 million in settlement

payments and that their obligations were limited to 40% of IMI's future losses.  IMI's

Statement of Undisputed Facts at 16; Gauss Supp. Aff. at Ex. 25.  IMI's counsel

requested that American National and Ohio Casualty make payment to IMI of the $2.4

million American National and Ohio Casualty had not disputed that they were obligated

to pay, using their own calculations and assumptions.  Id. at 17.  To date, neither

American National nor Ohio Casualty has made any payment to IMI of any kind.

Through January 2005, IMI had incurred over $18 million in costs to investigate

and resolve the underlying claims.  See Swaidner Aff. at ¶ 7.  Despite receiving numerous

notices of the underlying claims against IMI, including the opportunity to review

voluminous information maintained by IMI and Zurich in connection with Zurich's

adjustment of the underlying claims, neither American National nor Ohio Casualty ever

accepted coverage, agreed to defend or indemnify IMI in whole or in part, or retracted

their denial of coverage in this action.  IMI's Statement of Undisputed Facts at 17; citing

Swaidner Aff. at ¶ 8.

This conflict has spawned the current litigation now before the Court.  As

previously stated, on February 13, 2003, following IMI's insurers' refusal to defend or

indemnify IMI, this action was commenced by IMI against Zurich, American National,

Ohio Casualty, National Surety Corporation, and American Guarantee & Liability

Insurance Company.  See Docket No. 1 (Notice of Removal).  On September 16, 2004,

IMI, Zurich, American Guarantee, and Northern (collectively "Zurich") entered into a

confidential settlement agreement.  Ohio Casualty and American National have refused to

acknowledge and recognize IMI's settlement with Zurich because, in short, the terms of

the settlement agreement require Ohio Casualty and American National to pay IMI more

than either of them believes it is required to pay under the terms of its insurance policies

and Indiana law.  Id.  In this motion for summary judgment, IMI seeks approval and

enforcement of IMI's settlement agreement with Zurich, and a ruling that the Ohio

Casualty defendants are bound by the terms of that agreement.

## STANDARD OF REVIEW

On summary judgment, a party is entitled to judgment if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Omega

Healthcare Investors, Inc. v. Res-Care, Inc., 475 F.3d 853, 857 (7th Cir. 2007).   A

genuine issue of material fact exists for trial when, in viewing the record and all

reasonable inferences drawn from it in a light most favorable to the nonmovant, a

reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Venters v. City

of Delphi, 123 F.3d 956, 962 (7th Cir. 1997).  The movant bears the burden of

establishing that there exists no genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  If the movant meets this

burden, the nonmovant must set forth specific facts that demonstrate the existence of a

genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.

## LEGAL ANALYSIS

I.    The American National's and Ohio Casualty's Insurance Policies Provide
      Coverage for the Underlying Claims

The parties vigorously debate whether American National and Ohio Casualty are

25

bound by the terms of the Confidential Settlement Agreement and Release (attached at

Tab 1 to IMI's Brief) entered into by IMI and Zurich on September 16, 2004.  Clearly,

American National and Ohio Casualty are not parties to the Confidential Settlement

Agreement and Release ("the Settlement Agreement"), and thus neither is directly bound

by such agreement for the simple reason that the Settlement Agreement between IMI and

Zurich cannot modify the rights and obligations of the parties under the separate and

distinct American National and Ohio Casualty contracts.  Robinson v. Ada S. McKinley

Community Services, Inc., 19 F.3d 359, 363 (7th Cir. 1994) (Illinois law) (stating that

basic contract principles and notions of fairness require mutual agreement of the parties to

modify a contract).  Although not controlling here, a California Supreme Court decision

is nonetheless informative.  Faced with a similar issue, that court concluded "that a

settlement between parties on an insurance claim provided an insufficient basis for

collateral estoppel . . . there must be a conclusive judicial determination of the insured's

liability before another party may use it against the insurer."  Cal. State Auto. Assoc.

Inter-Ins. Bureau v. Superior Court of San Francisco, 50 Cal.3d 658, 662-63 (Cal. 1990);

cited by Bedree v. Wells Fargo Bank, 2007 WL 778436 (Ind. App. Ct. March 16, 2007)

(unpublished decision).  In the case at bar, we find that American National and Ohio

Casualty's rights and obligations are governed by the terms of their own respective

insurance contracts and by Indiana law.  Having so concluded, Defendants American

National and Ohio Casualty's Motion for Continuance of Summary Judgment Briefing

pursuant to Rule 56(f) is DENIED as moot.  [See Docket No. 340.]

Having determined that Defendants can not be bound by the terms of the Zurich Settlement agreement, the primary issue becomes whether the American National and Ohio Casualty insurance policies provide coverage for the underlying claims at issue in this case.

IMI contends that we need not address the coverage of the American National and Ohio Casualty's insurance policies because these insurers effectively forfeited any rights they might otherwise have had to dispute coverage under the policy based on implied waiver and equitable estoppel by waiting in excess of two years to seek leave to obtain a declaratory judgment, failing to actually defend IMI subject to a reservation of rights, and failing to obtain a non-waiver agreement from IMI.  IMI's Memo in Supp. at 21-28; IMI's Reply at 38; citing Docket No. 304; Federal Ins. v. Stroh Brewing Co., 127 F.3d 563, 571 (7th Cir. 1997) (applying Indiana law); Employers Ins. of Wausau v. Recticel Foam Corp., 716 N.E.2d 1015, 1028 n.16 (Ind. Ct. App. 1999).  In addition, IMI contends that Ohio Casualty is estopped from "denying its clear commitment to pay at least 40 percent of IMI's future defense and settlement costs . . . . Because Ohio Casualty has admitted there is at least coverage in part, and has represented to its insured that it would pay, it may not now back out of those obligations."  IMI's Reply at 38.

Ohio Casualty responds by conceding that the filing of a declaratory judgment action or hiring independent counsel to defend its insured under a reservation of rights are means by which an insurer can avoid the effects of collateral estoppel, which prevents an insurer from contesting the underlying judgment.  Equitable estoppel barring an insurer

27

from relying on the coverage defenses is not applicable here.   Defs.' Resp. at 52, citing

Recticel Foam, 716 N.E.2d at 1028 at 1028 n.16.

In Indiana, the general rule is that the doctrines of estoppel and waiver are not

available to "create or extend the scope of coverage of an insurance contract."

Transcontinental Ins. v. J.L. Manta, Inc., 714 N.E.2d 1277, 1280 (Ind. Ct. App. 1999).

Equitable estoppel is an equitable doctrine whereby a person's own acts or conduct of

fraud, either actual or constructive, prevent that person from claiming a right to the

detriment of another party who was entitled to and did rely on the person's conduct.  See

Matter of Edwards, 694 N.E.2d 701, 715-16 (Ind. 1998); In re Bender, 844 N.E.2d 170,

184 (Ind. Ct. App. 2006); Protective Insurance v. Coca-Cola Bottling, 423 N.E.2d 656,

661 (Ind. Ct. App. 1981) (stating "[t]he failure of an insurer to disclaim liability or deny

coverage as soon as is reasonably possible after a demand has been made may result in a

waiver or estoppel," when the delay prejudices the insured).  While a "waiver is an

intentional relinquishment of a known right and is a voluntary act, [] the elements of

estoppel are the misleading of a party entitled to rely on the acts or statements in question

and a consequent change of position to his detriment."  See Tate v. Secura Ins., 587

N.E.2d 665, 671 (Ind. 1992).

IMI's contention that American National and Ohio Casualty are estopped from

denying coverage under its policy under the doctrine of implied waiver and equitable

estoppel because the insurers waited more than two years to seek leave to obtain a

declaratory judgment is not well founded.  While IMI and Zurich had reportedly "settled

28

hundreds of claims and paid over $5 million" by March 2005, the current suit to determine the insurers' liability was commenced on February 13, 2003, making superfluous a declaratory judgment action by them after that point in time. See Complaint, IMI's Reply at 38. At the time this suit was filed, Ohio Casualty and Zurich had denied that their insurance policies covered the underlying claims. Thus, in this particular circumstance, because litigation was already underway to resolve the issue, Defendants were not required to defend IMI subject to a reservation of rights, or to obtain a non-waiver agreement from IMI in order to avoid equitable estoppel. IMI's argument that Ohio Casualty is estopped from denying its commitment to pay 40 percent of IMI's future defense costs is similarly not persuasive because the offer was made while this litigation was pending, because Ohio Casualty has maintained throughout the litigation that it is not required to pay for any of IMI's defense or settlement costs, and because Ohio Casualty contends that this offer was in the nature of an informal settlement negotiation. Ohio Casualty maintains that, while the litigation was pending and no formal settlement had been reached, IMI could not have reasonably relied on this contingent offer by IMI.

Accordingly, judgment cannot be granted to IMI on equitable grounds alone, and so we turn now to the legal merits of IMI's claim that it is entitled to coverage on the underlying claims by Defendants. Ohio Casualty and American National argue that their excess/umbrella liability policies do not provide coverage for the underlying claims because there was: (1) no "occurrence"–as that term is defined by the policies; and/or (2)

no collateral or consequential "property damage" sustained by third parties.  Docket No. 342 at 13.

    A.    <u>There was an "Occurrence" Resulting in "Property Damage"</u>

Under Indiana law, an insured is required to prove that its claims fall within the coverage provision of its policy–in this case, that there was an "occurrence" resulting in "property damage" during the coverage period–but the insurance provider bears the burden of proving specific exclusions or limitations to policy coverage.  <u>Indiana Funeral Directors Ins. Trust v. Trustmark Ins. Corp.</u>, 347 F.3d 652, 654 (7th Cir. 2003), citing <u>Erie Ins. Group v. Sear Corp.</u>, 102 F.3d 889, 892 (7th Cir. 1996) (applying Indiana law). We interpret an insurance policy similarly to other contracts.  "If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning."  <u>Allstate Insurance Co. v. Dana II</u>, 759 N.E.2d 1049, 1054 (Ind. 2001) ("<u>Dana II</u>"), quoting <u>Eli Lilly & Co. v. Home Ins. Co.</u>, 482 N.E.2d 467, 470 (Ind. 1985).  "'It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured.'" <u>Dana II</u> at 1056, quoting <u>Bosecker v. Westfield Ins. Co.</u>, 724 N.E.2d 241, 244 (Ind. 2000) (internal citations omitted).

    1.    <u>The incorporation of the defective coarse aggregate was an</u>
<u>"accident"</u>

The policies' definition of "occurrence" requires that "property damage" be caused by "*an accident*, including continuous or repeated exposure to substantially the same

30

general harmful conditions[.]" (emphasis added).  The "occurrence" definition thus focuses on the accidental nature of the conduct.  <u>Jim Barna Log Systems Midwest, Inc. v. General Casualty Ins. Co. of Wisconsin</u>, 791 N.E.2d 816, 824 (Ind. Ct. App. 2003). Ohio Casualty argues that because the damages alleged by the underlying claimants arose from intentional/volitional acts by IMI, rather than from "accident[s]," there was no "occurrence" triggering coverage.  Defs.' Response at 15-17; referencing <u>Erie Ins. Co. v. American Painting Co.</u>, 678 N.E.2d 844 (Ind. Ct. App. 1997) (fire was not an "accident" when property damage was alleged to have arisen from the company's hiring and retention of its employee).  In response, IMI states that this is a case about product liability and that the incorporation of the defective aggregate supplied by another company accidentally caused ACR, an unexpected happening which IMI never intended or designed.

Both American National and Ohio Casualty's insurance policies provide coverage for liability arising from an "occurrence," and both define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions[.]"  The Indiana Supreme Court has stated that, in cases in which there are evolving damages, an "occurrence" may take place over time.  See <u>Dana II</u>, 759 N.E.2d at 1057-58 (Ind. 2001); citing <u>Eli Lilly & Co. v. Home Ins. Co.</u>, 653 F. Supp. 1, 10 (D.D.C. 1984).

While this motion for summary judgment was pending, the Indiana Supreme Court handed down an opinion discussing in detail the meaning of accident in the insurance

31

policy context.[13]  In Auto-Owners Insurance Company v. Harvey, the Supreme Court of

Indiana held that, under the applicable homeowners insurance policy, a genuine issue of

material fact existed as to whether a drowning death was caused by an "occurrence" when

the insured pushed the victim, who then slipped and fell from a dock platform, and into a

river, where she drowned.  The insured pled guilty to involuntary manslaughter, but

claimed he did not intend for the victim to slip, fall and drown.  842 N.E.2d 1279 (Ind.

2006).  Because the insurance contract was ambiguous as to whether the relevant event

was the pushing or the drowning, for the purpose of determining if there was an

accident/occurrence, the ambiguity was construed in favor of the insured.

The Harvey Court stated, "Indiana case law has held that, 'in the context of

insurance coverage, an accident means an unexpected happening without an intention or

design.'"  Auto-Owners Insurance Company v. Harvey, 842 N.E.2d 1279 (Ind. February

22, 2006), quoting Terre Haute First Nat. Pacific Employers Ins. Co., 634 N.E.2d 1336,

1338 (Ind. Ct. App. 1993); see also City of Jasper Indiana v. Employers Ins. of Wausau,

987 F.2d 453, 457 (7th Cir. 1991) (defining accident under Indiana law as "an unusual,

unexpected, and unforeseen event.").  In addition, the Harvey Court provided several

examples of decisions involving the issue of whether 'occurrence' applied to

---

[13]  This opinion prompted the parties to fully brief two issues: 1) does Harvey apply to this case, and 2) do the underlying claims involve an "accident."  First, IMI filed its Notice of Supplemental Authority, then Defendants' filed their Response to Notice of Supplemental Authority [Docket No. 475]; followed by IMI's Motion to Strike or, in the Alternative Motion for Leave to File Reply [Docket No. 481].  After reviewing the briefings and exhibits, the Court now DENIES IMI's Motion to Strike and GRANTS the Motion for Leave to File the Attached Reply, which briefing, incidentally, was as lengthy as the submitted supplemental opinion.

circumstances arising from claims based on commercial or professional conduct.  842

N.E.2d at 1284.  These examples included:

> Transamerica Ins. Serv. v. Kopko, 570 N.E.2d 1283, 1284-85
> (Ind.1991) (holding that a liability policy's "occurrence"
> requirement, which was defined to require an "accident," did
> not cover a claim against an insured home builder by the
> home purchaser claiming the house settled due to the
> instability of the sub-soil); Erie Ins. Co. v. Am. Painting Co.,
> 678 N.E.2d 844, 845-46 (Ind. Ct. App. 1997) (finding a claim
> of negligent hiring and retaining of a painter who allegedly
> burglarized a home did not arise from an accident, and thus
> was not an occurrence covered under the liability insurance
> contract), trans. not sought; R.N. Thompson & Assoc. v.
> Monroe Guar. Ins. Co., 686 N.E.2d 160, 164-65 (Ind. Ct.
> App.1997) (finding economic losses arising from inadequate
> materials and substandard construction work were not an
> accident or occurrence), trans. denied; Terre Haute First Nat'l,
> 634 N.E.2d at 1338 (finding a claim for Bank's negligence
> and breach of fiduciary duty in acting as plaintiff's guardian
> was not covered as an accident or occurrence under a liability
> insurance policy); City of Muncie v. United Nat'l Ins. Co.,
> 564 N.E.2d 979, 982 (Ind. Ct. App.1991) (affirming summary
> judgment for a liability insurer where insured asserted that an
> action for wrongful discharge of employees was covered as
> "occurrence" defined as conduct of insured that results in
> harm "neither expected nor intended"), trans. not sought.

American National and Ohio Casualty contend that Harvey is helpful to their case

in that it makes clear that the definition of an "occurrence" can differ in the commercial

context and that defective workmanship that results in damages only to the work product

itself is not an "occurrence."  Amerisure, Inc. v. Wurster Construction Co., Inc., 818

N.E.2d 998, 1004 (Ind. Ct. App. 2004) (stating that majority of courts have determined

that faulty workmanship is not an accident and, therefore, not an occurrence[14]).

IMI contends that <u>Amerisure</u> and the construction defect cases cited therein are inapplicable, because ours is a case about product liability, not construction defects. IMI's Resp. at Docket No. 481, p.2.  IMI argues that the problem or "defect" is not with IMI's concrete *per se*, but rather with a defective ingredient supplied to IMI by Hanson. IMI acknowledges that it faces third party liability for problems due to its product – concrete – but it contends that it stands in an entirely different position from the construction contractor policyholders in the construction defect cases on which Ohio Casualty relies, where the contractor performed substandard work and the courts held that damage resulting from that poor work was a natural and ordinary consequence of poor workmanship.  <u>Id.</u> at 3.  IMI argues that this case is much more closely comparable to <u>United States Fidelity & Guarantee v. American Insurance Co.</u>, 345 N.E.2d 267 (Ind. Ct. App. 1976), where the insured manufactured bricks – a product – which were then sold to others for use in constructing buildings.  When litigation resulted based on failures in the

---

[14] <u>See e.g.</u>, <u>Indiana Insurance Company v. Hydra Corp.</u>, 245 Ill. App.3d 926, 185 Ill. Dec. 775, 615 N.E.2d 70 (1993) (cracks in floor and loose paint were natural and ordinary consequences of installing defective concrete flooring and applying wrong type of paint and did not constitute an accident); <u>Hawkeye-Security Insurance Co. v. Vector Construction Co.</u>, 185 Mich. App. 369, 460 N.W.2d 329 (1990) (defective workmanship was not the result of an occurrence); <u>Heile v. Herrmann</u>, 136 Ohio App.3d 351, 736 N.E.2d 566 (1999) (determining that homeowners' claims against contractor for defective workmanship did not arise from an occurrence where alleged damages all related to contractor's or subcontractors' work); <u>Pursell Construction, Inc. v. Hawkeye-Security Insurance Co.</u>, 596 N.W.2d 67 (Iowa 1999) (holding that "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy"); <u>McAllister v. Peerless Insurance Company</u>, 124 N.H. 676, 474 A.2d 1033 (1984) (determining that defective work, standing alone, did not result from an occurrence).

bricks referred to as "spall," the Indiana Court of Appeals held that the insured was

entitled to coverage for all amounts except the cost of the bricks themselves.

We find no evidence to show that IMI knowingly incorporated defective coarse

aggregate in its concrete mix.  Nor is there any evidence indicating that IMI expected or

intended to cause the reactions that occurred when sufficient moisture came into contact

with the reactive aggregate, causing the distress and consequential damages that gave rise

to all of the underlying claims.  Thus, we hold that there was in this case, with respect to

the manufacture of these batches of concrete, an "accident," as referenced in and

anticipated by the insurance policies' definition of "occurrence."[15]

> 2.    Collateral or consequential "property damage" in excess of
> the underlying insurance was actually sustained by third
> parties within the effective periods of the Ohio Casualty
> insurance contracts.

Ohio Casualty contends that IMI has not proven that there was collateral or

consequential "property damage" in excess of the underlying insurance that was actually

sustained by third parties within the effective periods of the Ohio Casualty insurance

contracts.  Defs.' Resp. at 20-21.  Under the insurance policies:

> "Property damage" means: . . . physical injury to
> tangible property, including all resulting loss of use of that
> property.  All such loss of use will be deemed to occur at the
> time of the physical injury that caused it; or [] loss of use of
> tangible property that is not physically injured.  All such loss
> will be deemed to occur at the time of the "occurrence" that

_____

[15]  However, as explained below in the section on policy exclusions, coverage of
the "accident" is limited to consequential damages and does not cover IMI's own work
product or the defective concrete itself.

caused it.

The Indiana Supreme Court has stated that, in cases in which there are evolving damages, an "occurrence" may take place over time.  See Dana II, 759 N.E.2d at 1057-58 (Ind. 2001); citing Eli Lilly & Co. v. Home Ins. Co., 653 F. Supp. 1, 10 (D.D.C. 1984). "The insurance industry changed to occurrence-based coverage in 1966 to make clear that gradually occurring losses would be covered so long as they were not intentional." Appalachian Insurance Co. v. General Electric Co., 2007 N.Y. LEXIS 119, *14 (N.Y. Feb. 15, 2007), quoting Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648, 609 N.E.2d 506 (1993).  By encompassing "'continuous or repeated exposure to conditions,' as well as the sudden events traditionally associated with an accident, the occurrence model more readily embraced a wider range of liabilities–such as liability arising from asbestos exposure or contamination."  Id.

Defendants argue that, under Indiana law, the time of an "occurrence" within the meaning of a liability insurance contract is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.  U.S. Fidelity & Guaranty Co. v. American Ins. Co., 345 N.E.2d 267, 270 (Ind. Ct. App. 1976); Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co., 987 F.2d 415, 418 (7th Cir. 1993).  In our case, ACR or degradation began almost immediately when the defective concrete was poured, but "[t]he effects of the ACR reaction [were] generally not manifested or visible to the naked eye until much later, when cracks or other evidence of expansion [became] visible. . . ."  IMI's expert, Michael A. Ozol, Ph.D., Aff. ¶ 7.  Ohio

36

Casualty maintains that, if the effects of ACR within the concrete itself generally do not manifest until much later (i.e., after the pour), then it follows that actual damage to adjacent collateral property, if any, would not occur until even longer after that.  Defs.' Resp. at 21.  Thus, Ohio Casualty argues that IMI has not met its burden of proving that damage to collateral property in excess of the Underlying Insurance actually occurred during the effective Policy Periods.  Id.

We disagree with Defendants' analysis and think that the time of the occurrence in this continuing loss circumstance is best described as the point when the concrete was poured (the first time IMI is potentially liable to a third party) and continued through the time at which the third party discovered or was notified of the damage to its property and had an opportunity to prevent further damage from the defective concrete.  See generally Dana II.

Contrary to Defendants' contention, IMI has clearly shown that there was collateral or consequential "property damage" in excess of the underlying insurance that was actually sustained by third parties within the effective periods of the Ohio Casualty insurance contracts.  Each of the claimants in the underlying lawsuits alleged that the distress and expansion of the concrete in question resulted in damage to their property, including consequential damages.  IMI's Statement of Undisputed Facts at 7; citing Corbin Complaint, Docket No. 102, Exh. 24 at ¶¶ 18, 21, 24 and 29; Staton Complaint, Docket No. 102, Exh. 25, at ¶¶ 32, 36, 44, 51, 67 and 78; Lewis Complaint, Docket No. 102, Exh. 26 at ¶¶ 7-11, 28.  IMI's expert determined that the distress produced by the

alkali carbonate reactivity in the coarse aggregate provided by Hanson's quarry in Princeton resulted in the property damage that occurred and was occurring during the September 1999 to September 2001 time period.  Ozol Aff. at ¶¶ 6-11.  This damage was not limited to the concrete itself but collaterally as well from the shoving, buckling, or crushing of adjacent materials, structures, and joints.  IMI's Statement of Undisputed Facts at 7; citing Ozol Aff. at 6-11; <u>Corbin</u> Complaint, Docket No. 102, Exh. 24 at ¶¶ 18, 21, 24 and 29; <u>Staton</u> Complaint, Docket No. 102, Exh. 25, at ¶¶ 32, 36, 44, 51, 67 ant 78; <u>Lewis</u> Complaint, Docket No. 102, Exh. 26 at ¶¶ 7-11, 28.  Before settling any of the underlying claims or making any settlement payments to any of the claimants, IMI represents that it verified in each instance that a reaction was taking place in the concrete in question and that it was due to defective or substandard coarse aggregate.  Swaidner Dep. at p. 122, line 5 through p. 124, line 22; Swaidner Aff. ¶ 8.[16]

Defendants next argue that, even if IMI has shown that there was collateral or consequential "property damage" in excess of the underlying insurance that was actually sustained by third parties within the effective periods of the American National and Ohio Casualty insurance contracts, the insurance contracts contain the following exclusions which apply here:

IV.    EXCLUSIONS

This insurance does not apply to:

---

[16]  See Docket No. 353, Exh. M (Letter from Gauss with attached spreadsheet updated on 3/17/05 detailing claims made against IMI).

\* \* \* \* \*

E.     "Property damage" to "impaired property" or property
       that has not been physically injured, arising out of:

       1.      a defect, deficiency, inadequacy or dangerous
               condition in "your product" or "your work";

                       \* \* \* \* \*

       This exclusion does not apply to the loss of use of
       other property arising out of sudden and accidental
       physical injury to "your product" or "your work" after
       it has been put to its intended use.

F.     "Property damage" to "your product" arising out of it
       or any part of it.

                       \* \* \* \* \*

G.     "Property damage" to "your work" arising out of it or
       any part of it and included in the "products-completed
       operations hazard."

       This exclusion does not apply if the damaged work or
       the work out of which the damage arises was
       performed on your behalf by a subcontractor.

H.     Damages claimed for any loss, cost or expense
       incurred by you or others for the loss of use,
       withdrawal, recall, inspection, repair, replacement,
       adjustment, removal or disposal of:

       1.      "your product";

       2.      "your work";

       3.      "impaired property"

       if such product, work or property is withdrawn or
       recalled from the market or from use by any person or

39

organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

The American National and Ohio Casualty umbrella insurance contracts also contain the following definitions:

> E.  "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
>
>> 1.  it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>>
>> 2.  you have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
>> 1.  the repair, replacement, adjustment or removal or "your product" or "your work"; or
>>
>> 2.  your fulfilling the terms of the contract or agreement.
>
> * * * * *
>
> L.  1.  "Products-completed operations hazard" means all "bodily injury" and "property damage" from an "occurrence" taking place away from premises you own or rent and arising out of "your product" or "your work" except:
>
>> a.  When all of the work called for in your contract has been completed.
>>
>> b.  When all of the work to be done at the site has been completed if your

40

contract calls for work at more than one site.

c.    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which I otherwise complete, will be treated as completed.

\* \* \* \* \*

P.    "Your product" means:

1.    Any goods, or products, other than real property, manufactured, sold, handled, distributed or disposed of by;

a.    you; . . .

\* \* \* \* \*

Q.    "Your work" means:

1.    Work or operations performed by you or on your behalf; and

2.    Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

1.    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

2.    The providing of or failure to provide

41

warnings or instructions.

Ohio Casualty contends that, depending on the facts of a particular claim, one or more of the above-listed coverage exclusions may be applicable so as to exclude any otherwise triggered coverage. The coverage exclusions for "your product" and "your work," Ohio Casualty argues, serve to preclude any liability coverage for "property damage" to IMI's "product" or its "work" (i.e., the concrete itself and the "flatwork"). Defs.' Response at 25; citing U.S.F.&G. Co., 345 N.E.2d at 272 (stating that, under these exclusions, a manufacturer, will not be reimbursed by a liability insurer for costs associated with the repair, replacement, adjustment or removal of its "product" or its "work.")

We agree with Defendants' interpretation of the policies on this specific issue. In reading the policies, the exclusions state that no coverage exists for damage to IMI's property, but do not provide that no coverage exists for the liability to third parties resulting from that damage. Thus, the policies are fairly read to apply only to exclude repair or replacement of IMI's property or work product, not to exclude liability to third parties.[17] See Dana II at 1056. This reading of the policy language is consistent with other

_____

[17] IMI argues that it reached a compromise of disputed legal differences with Zurich in the Zurich Settlement Agreement that assumes a portion of the loss is not covered, to wit, the cost of "IMI's work," or the cost of the concrete that contains the defective coarse aggregate from Hanson. As the settlement IMI reached with Zurich represents a good faith compromise of disputed legal issues, IMI asserts that this court "need not and should not decide in this motion the scope of the 'your work' or 'your product' exclusions in Ohio Casualty's policies because this issue is irrelevant to this motion." IMI's Memo in Supp. at 3.

We stress that Ohio Casualty and American National are not bound by the Zurich

(continued...)

commercial general liability insurance policies which have been found to "cover the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property *other than* to the product or completed work itself, and for which injury or damage the insured might be exposed to liability." R.N. Thompson & Associates, Inc. v. Monroe Guarantee Ins. Co., 686 N.E.2d at 160, 162-63 (Ind. Ct. App. 1997) (emphasis in original); see also Dana II at 1056.  Defective workmanship that results in damages only to the work product itself, however, is not an occurrence under a standard CGL policy.  See Amerisure, Inc. v. Wurster Construction Co., Inc., 818 N.E.2d 998, 1004-05 (Ind. Ct. App. 2004); Unigard Mut. Ins. Co. v. McCarty's Inc., 756 F. Supp. 1366, 1369 (D. Idaho1988) (highlighting difference between claims for property damage and claims for liability resulting from property damage).  Thus, this exclusionary language in the policies does not foreclose coverage for the third-party claims against IMI.

   B.   The Underlying Claims Against IMI Result from a Single Occurrence

Both parties dedicate a substantial portion of their briefing to the issue of whether the underlying claims against IMI resulted from a single "occurrence."  IMI asserts that they entered into occurrence-based policies with Defendants where all of the underlying

---

[17](...continued)
Settlement Agreement and, in any event, the Court does not have before it the information necessary to make a claim-by-claim determination of the scope of "your work" or "your product."  We are confident, however, that the parties, each of whom is an expert in their respective fields of business, are capable–just as IMI and Zurich have been–of reaching a good faith agreement as to the meaning of these terms when they are applied to the facts of each underlying claim without requiring further this court's assistance.

claims are traceable to "one proximate, uninterrupted and continuing cause," that being the repeated integration of "the defective, high alkali course aggregate provided by Hanson" into IMI's concrete.  Thus, according to IMI, there was a single occurrence.  (IMI's Brief at 41-42; IMI's Reply at 22.)  Ohio Casualty disagrees that there was an occurrence at all, but argues that, if it is determined that there was an occurrence, it would have been multiple occurrences.  Defs.' Resp. at 25.

Our research has revealed that the Indiana Court of Appeals and the Indiana Supreme Court have not addressed the issue of more than one "occurrence" in any published decision.  However, as both parties note, a majority of other courts who have addressed this issue have focused on the cause or causes of the resultant damage in determining the number of "occurrences," rather than basing that determination on each individual claimant's injury or the number of claims.  See e.g. Michigan Chemical Corp. v. American Mutual Reinsurance Co., 728 F.2d 374, 383 (6th Cir. 1983) (explaining that the cause of the "occurrence" is the act that gives rise to the insured's liability); Uniroyal, Inc. v. Home Ins., 707 F. Supp. 1368, 1380 (E.D.N.Y. 1988).  In determining the number of "occurrences," courts look to the event for which the insured is liable, not to some other point or factor in the causal chain.  Dicola v. American S.S. Owners Mut. Protection & Indem. Assoc., 158 F.3d 65, 80 (2d Cir. 1998).  In distinguishing losses that arise from a single occurrence as opposed to those that constitute multiple occurrences, courts are to consider "whether there is a close temporal and spatial relationship between the incidents giving rise to the injury or loss, and whether the incidents can be viewed as part of the

same causal continuum, without intervening agents or factors." Appalachian Insurance
Co. v. General Electric Co., 8 N.Y.3d 162, 2007 WL 470394 (N.Y. Feb. 15, 2007)
(holding that personal injury claims arising from individuals' exposures to asbestos
insulation in GE turbines at work sites across the country claims presented multiple
occurrences).

     In Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co., 447 F.2d 204 (5th Cir.
1971) (Texas law), the insured had made sales of contaminated birdseed to eight dealers
who, in turn, sold that tainted seed to pet owners. Many birds died from eating the seed.
Several owners of birds that died made claims against the seed dealers, who, in turn, made
claims against the insured. Id. at 205. One insurer in defending against the claims
contended that there was but one "occurrence" and that was the contamination of the seed.
The Fifth Circuit rejected this argument, ruling that each of the eight sales constituted a
separate occurrence because the sales, rather than the mere acquisition or possession of the
contaminated seed, created the exposure to liability. Id., 447 F.2d at 206-07.

     In Michigan Chemical Corp. v. Amer. Home Assurance Co., 728 F.2d 374 (3rd Cir.
1982) (applying Illinois law), the insured mistakenly shipped bags of a toxic chemical,
rather than the intended livestock feed supplement, to a distributor. The distributor,
assuming he had received the feed supplement as requested, mixed the toxic chemical with
regular feed and sold the combined product to dairy farmers. Many animals died or had to
be destroyed as a result, and their owners sued the insured for those losses. The Sixth
Circuit held: "So long as [insured] MCC retained possession of the [toxin], no liability

45

could result. The shipment of the substance constituted the act from which liability arose. Other shipments, if any took place, created additional exposure to liability and therefore were separate occurrences." Id. at 383.

In Uniroyal, Inc. v. Home Ins., 707 F. Supp. 1368, 1380 (E.D.N.Y. 1988), the manufacturer of Agent Orange, after settling product liability litigation with plaintiffs, brought an action against its insurer for indemnification. The district court held that there was a single "occurrence," which consisted of the manufacturer's delivery of chemicals to the military. There, the court stated:

> The deliveries by Uniroyal have constituted a single continuous occurrence, a "continuous or repeated exposure to conditions." They were part of a routinized, repetitive process through which a large supply of herbicides was funneled to the military. The number of deliveries was happenstance, determined by the size of available transportation freight cars and in no way by the military's need for 110 separate "pieces" of herbicide.

Id. at 1383. In distinguishing Michigan Chemical and Pincoff, the Uniroyal court ruled that "the herbicide deliveries were so numerous, uniform, routinized and regularized, at such steady and frequent intervals, that they merged into one continuous and repeated event." Id. at 1385. "[W]hen 'the individual acts that comprise occurrences are repeated with such frequency-indeed, on a daily basis for six years-[then] they appear to lose their distinctiveness and ... merge' into one continuing occurrence." Id.; citing Rodburg & Chesler, *Beyond the Pollution Exclusion: Emerging Parameters of Insurance Coverage for Superfund Liability*, in PLI, Hazardous Waste Litigation, at 347, 374 (1985).

Ohio Casualty argues in the case at bar that, as with the insureds in Pincoffs and Michigan Chemical, IMI did not face potential exposure until it sold and delivered its products and that IMI's potential exposure increased with each sale and delivery of the hundreds of batches of various tainted formulations of ready-mix concrete it manufactured.  Defs.' Resp. at 30.

IMI distinguishes its circumstances from those in Pincoffs and Michigan Chemical, arguing that the source of IMI's liability for the underlying claims is not simply based on the sale of the contaminated product or the negligent shipment of the wrong product, but rather, "all of the underlying claimants seek to impose liability upon IMI as a result of the same acts or omissions – IMI's alleged failure to take reasonable measures to prevent the incorporation of defective coarse aggregate in its concrete."  IMI's Reply at 23.

Ohio Casualty maintains that, unlike the manufacturer in Uniroyal, there was no single, continuous, uninterrupted production process at IMI.  IMI manufactured each of its twelve standard formulations of ready-mix concrete and its numerous specialty mixes according to particular specifications at two separate plants, operating at separate locations under separate management and the concrete was ordered, produced and delivered on an "as needed basis" and sold at varying prices.  Defs.' Resp. at 34.  Accordingly, Ohio Casualty argues, there was not any single, proximate, uninterrupted, continuous and consistent process or cause to account for the alleged injuries and damages.  Id.  IMI rejoins that the mixing of concrete at two facilities and selling the concrete consisting of specific formulations to various customers at differing prices according to individualized

contractual terms are simply irrelevant factors, given that the cause of the distress in the concrete that is the subject of the underlying claims was due in every instance to the defective coarse aggregate from Hanson's Princeton quarry.

Our considered judgment leads us to conclude that the insurable event – or "occurrence" – in this case was each sale of defective aggregate by IMI to its customers. Our analysis begins by reviewing the terms of the insurance contract. American National's and Ohio Casualty's insurance contracts provide that an "occurrence" means "an accident including continuous or repeated exposure to substantially the same general harmful conditions." This provision which references continuous or repeated exposure, while it supports IMI's contention that damage resulting from the defective aggregate whose effects are only noticeable over time is covered by the policy, does not support the aggregation of customers' claims into a single "occurrence." Courts are to identify the event for which the insured is liable under their contract, which is, in this case, the distribution of the defective concrete, rather than some other event in the causal chain, such as IMI's receipt of faulty aggregate from Hanson's Princeton quarry. Dicola v. American S.S. Owners Mut. Protection & Indem. Assoc., 158 F.3d 65, 80 (2d Cir. 1998).

IMI did not become liable to any third party at the point when it contracted with Hanson or even when it incorporated Hanson's defective aggregate into its concrete. Liability arose only when IMI sold the defective concrete (incorporating into it the defective aggregate) to its customers. See Michigan Chemical and Pincoff. Unlike Uniroyal, IMI's mixing and distribution of the concrete batches did not occur pursuant to a

single contract with a single customer.  IMI had multiple sales contracts with multiple customers and these contracts were almost entirely unrelated to each other, both temporally, in that they were spread over the course of two-and-a-half years, and spatially, as the concrete was delivered to multiple job sites.  Thus, the type and amount of resulting damage was influenced by numerous factors, such as IMI's various standard formulations for its ready-mix concrete as well as more than one hundred specialty formulations, each of which contained size 57 coarse aggregate from Hanson.  These multiple factors which generated the underlying claims cannot be fairly viewed as part of a single causal continuum.  See Appalachian Insurance Co.

Therefore, we conclude that each contract between IMI and a third party requiring IMI to deliver a specific formulation of concrete are to be deemed an occurrence under the insurance contract.  If delivery required multiple trucks to get a particular batch of concrete to a job site in order to fulfill a specific contract, that, too, would constitute a single occurrence, even if multiple pours were made from the same batch of concrete around the job site, since delivery was made pursuant to a single contract requiring IMI to supply the concrete to a particular third-party purchaser.

II.    The "Joint and Several" Allocation Approach is Applicable

IMI asks the Court to approve an allocation of all the losses it has incurred that exceed IMI's primary liability coverage to the Ohio Casualty excess/umbrella insurance contracts under the "joint and several" allocation approach or the "all sums" rule, as set

forth by the Indiana Supreme Court in <u>Allstate Insurance Company v. Dana Corporation</u>, 759 N.E.2d 1049 (Ind. 2001) ("<u>Dana II</u>").  IMI's Reply at 27.  IMI maintains that any of Defendants' policies which covers a period in which a portion of the loss occurred should be applied to cover the entire loss, citing the holding in <u>Dana II</u> which IMI interprets to give it the right to decide whether all of the policies apply to cover the risk and/or any one of the policies on the risk.  IMI's Reply at 31.

Objecting to IMI's interpretation, Defendants interpret <u>Dana II</u> to hold that the language of the insurance contract controls the evaluation of an insurer's obligation under that contract and that their contracts in this case provide coverage only for that portion of damages that took place within the policy period.  Defs.' Resp. at 40.  Ohio Casualty specifically argues that the "all sums" approach of <u>Dana II</u> does not apply here because: (1) the Ohio Casualty insurance contracts do not contain an "all sums" provision similar to that construed in <u>Dana II</u>; (2) the facts involved in this case are significantly different from those involved in <u>Dana II</u>; and (3) there is no logical basis on which "joint and several" liability can be applied since IMI has settled with and/or dismissed all the other defendant insurers, leaving Ohio Casualty as the "lone remaining party."  Defs.' Resp. at 35; citing IMI's Brief at 7.

We quote the relevant portion of <u>Dana II</u> below:

> There is no language in the coverage grant, including the
> definitions of 'property damage,' 'personal injury,' or
> 'occurrence,' that limits Allstate's responsibility to

> indemnification for liability derived solely for that portion of
> damages taking place within the policy period.  By the policy's
> terms, once an accident or event resulting in Dana's
> liability–an occurrence–takes place within the policy period,
> Allstate must indemnify Dana for "all sums" Dana must pay as
> a result of that occurrence, subject to the policy limits.  We
> agree with the Court of Appeals that whether or not the
> damaging effects of an occurrence continue beyond the end of
> the policy period, if coverage is triggered by an occurrence, it
> is triggered for "all sums" related to that occurrence.

Dana II at 1058.  The Indiana Supreme Court explained that "once a covered occurrence

takes place, Allstate is obligated to indemnify Dana for all sums related to that occurrence

up to the policy limits."  Dana II at 1060.  However, "the policies do not preclude

continuing exposure to conditions from being an occurrence for the purposes of more than

one policy period."  Dana II, at 1060; quoting Dana I, 737 N.E.2d at 1203, cf. Eli Lilly &

Co. v. Home Ins. Co., 482 N.E.2d 467, 471 (Ind. 1985) (coverage triggered at any point

between ingestion of DES and the manifestation of DES-related disease).  PSI Energy, Inc.

v. Home Ins. Co., 801 N.E.2d 705 (Ind. App. Ct. 2004) (stating: "The trigger of coverage

analysis applied in Dana is applicable to this case and requires that PSI prove that the

contaminants caused property damage during each policy period under which it seeks

coverage.")

In handing down its decision in Dana II, the Indiana Supreme Court construed the

following provision contained in Allstate's insurance contracts in 1977, 1978 and 1979:

"The Company hereby agrees, subject to the limitations, terms and conditions herinafter

mentioned, to indemnify the insured for all sums which the insured shall be obligated to

51

pay by reason of the liability . . .". Id. at 1053, n.3 (emphasis added). Allstate's contracts issued in 1980 and 1981 provided: "To indemnify the INSURED . . . for all sums which the INSURED shall be obligated to pay . . . ". Id. (emphasis added). Admittedly, the American National and Ohio Casualty insurance contracts do not contain the words "all sums," but provide instead:

> We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of . . . "property damage," . . . that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.

The insurance contracts construed in Dana II are thus clearly distinguishable from the insurance contracts at issue in this case. Ohio Casualty's and American National's insurance contracts are more narrowly drawn than Allstate's contract in Dana II, providing coverage only for those sums in excess of the Underlying Insurance that IMI becomes legally obligated to pay because of covered (i.e. collateral) "property damage" that occurred during the applicable Policy Periods (i.e., between September 1, 1999, and September 1, 2001) and was caused by an "occurrence." Thus, IMI is required to deplete its primary insurance during a policy period for the property damage resulting from an occurrence before resorting to its umbrella insurer to cover the remaining loss caused by the property damage that occurred during that policy period.[18]

_____

[18] We anticipate that the parties may disagree concerning the portion of the damage that occurred during each period. Proposals for how damages should be allocated between policy

(continued...)

III.   Defendants, American National Fire Insurance Company and the Ohio Casualty Insurance Company's, FRCVP 15(a) Motion for Leave to File an Amended Cross-Claim for Indemnity or Contribution, and for Bad Faith, Against Defendant, Zurich American Insurance Company [Docket No. 427]

Defendants have filed what they have captioned in somewhat less than pithy terms their "FRCVP 15(a) Motion for Leave to File an Amended Cross-Claim for Indemnity or Contribution, and for Bad Faith, Against Defendant, Zurich American Insurance Company." [Docket No. 427.]  Ohio Casualty and American National note that they have previously filed a Cross-Claim against Zurich for indemnity or contribution, see Docket No. 375, so, in effect, this motion simply seeks to amend that cross-claim to include their claim of bad faith.  Defendants maintain that their bad faith claim is warranted because "Zurich is engaging in [] a course of action in order to force American National and Ohio Casualty into a settlement with IMI that will improperly benefit Zurich."  Docket No. 427 at 8.  Zurich rejoins that Defendants have brought their claim of bad faith under the doctrine of equitable subrogation, a theory which can not withstand a motion to dismiss and thus should be denied by the Court at this stage of the proceedings.  Zurich's Resp. in

---

[18](...continued)
periods have not been submitted to us, and we are not equipped to propose a solution without adequate information.  We note, however, that coverage of the underlying claims (subject to particular exclusions for IMI's work) is spelled out in the insurance policies and that both the defense of and indemnity for these claims has been delayed long enough by Defendants.  The Court is confident that any remaining disputes between insurers regarding responsibility for payment of the underlying loss can be and should be worked out among the insurers.  "'It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured.'"  Dana II at 1056, quoting Bosecker v. Westfield Ins. Co., 724 N.E.2d 241, 244 (Ind. 2000) (internal citations omitted).

Opp. to Defs.' Motion for Leave at 2 [Docket No. 434].

Federal Rule of Civil Procedure 15(a) allows a party, with leave of court, to amend its pleading after a responsive pleading has been served.  Glick v. Koenig, 766 F.2d 265, 268 (7th Cir. 1985).  The court may deny the movant leave to file if the proposed amendment could not withstand a motion to dismiss.  Id.  Pursuant to Rule 12(b)(6), "A motion to dismiss is granted where it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  Lee v. City of Chicago, 330 F.3d 456, 459 (7th Cir. 2003).

As we have repeatedly emphasized throughout this opinion, Ohio Casualty and American National are not bound by the Zurich Settlement Agreement; their rights and obligations are determined exclusively by the insurance policies they entered into and by Indiana law.  Thus, Ohio Casualty and American National have no possible basis upon which to assert a claim of entitlement to relief for the alleged bad faith of Zurich.  Such a claim simply can not succeed, premised on a settlement agreement to which it is not a party and can not be legally bound.  Thus, Ohio Casualty and American National's Rule 15(a) Motion for Leave to File an Amended Cross-Claim for Indemnity or Contribution, and for Bad Faith, against Zurich American Insurance Company is DENIED.

IV.   Defendants, American National Fire Insurance Company and the Ohio Casualty Insurance Company's, Fed. R. Civ. P. 14(a) Motion for Leave to File a Third-Party Complaint for Indemnity or Contribution Against Northern Insurance Company, New Hampshire Insurance Company, Indemnity Insurance Company of North America, Travelers Property Casualty Company of America, Gulf Insurance Company, American Guarantee & Liability Insurance Company and National Surety Corporation [Docket No. 426.]

American National and Ohio Casualty also seek leave to file a third-party complaint for indemnity or contribution against the above named co-insurers of IMI.  Defendants argue that if this Court rules that the "all sums" rule of Dana II applies to the American National and/or Ohio Casualty insurance contracts, and that defendants may be held liable for "property damage" occurring before and/or after the Policy Period commencing on September 1, 1999, and terminating on September 1, 2001 (which is denied), or if the Court rules that there was a continuous "occurrence" triggering liability coverage of all insurers on the risk from 1997, through 2002, then (1) the primary liability insurance contracts issued by Northern Insurance Company covering September 1, 1997 through September 1, 1999 "also constitute Underlying Insurance that must be fully exhausted before the excess/umbrella coverage provided by American National and/or Ohio Casualty is triggered," and (2) American National and Ohio Casualty are entitled to indemnity by or contribution from any of the other insurers who also issued excess/umbrella liability insurance contracts to IMI during such period of time.

Zurich and IMI argue that Ohio Casualty has no reasonable and certainly no acceptable excuse for waiting two years to attempt to file a third-party complaint for contribution or indemnity, and that an order allowing impleader would greatly delay and unduly complicate the resolution of this case, as well as prejudice IMI and Zurich.  In any event, they assert, a proposed third-party complaint is better suited to an independent action.  Zurich's Resp. in Opp. at Docket No. 433; IMI's Response at Docket No. 435.

Federal Rule of Civil Procedure 14 provides that a defending party at any time after the commencement of the action, when leave is granted, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action, but who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim. Fed. R. Civ. P. 14(a).

The docket in this cause reflects the following procedural history: On October 14, 2003, IMI sought leave to file its Amended Complaint to add insurers as parties defendant and filed its Amended Complaint adding these insurers on November 18, 2003.  (#329, IMI Mot. Summ. J. App. Ex. 2 at ¶ 34).  Ohio Casualty did not assert any claims for indemnity or contribution as affirmative defenses in its Answer to Plaintiff's Amended Complaint nor did Ohio Casualty bring a Counterclaim against any of the then-co-defendant insurers.  More than a year and a half have passed since IMI dismissed virtually all of these insurers whom it had previously added, all without objection from Ohio Casualty.  (IMI dismissed Travelers Property Casualty Company of America and Gulf Insurance Company on March 5, 2005, National Surety Corporation on March 8, 2005 and Indemnity Insurance Company of North America on March 14, 2005.)  Ohio Casualty did file a Motion for Leave to File Cross-Claim and Counterclaim against New Hampshire following IMI's settlement with New Hampshire.  (Docket No. 359, Order at 3.)  IMI filed its Second Amended Complaint on September 8, 2005, after the Court granted IMI's leave to do so, and denied Ohio Casualty's Motion for Leave to File Cross-Claim and Counterclaim against New Hampshire and the other insurers. (Docket No. 359, Order at 3-

7).

The decision to allow a third-party complaint is a matter entrusted to the Court's discretion, based on the timeliness of the motion and any reasons that might explain and excuse the delay.  Highland Ins. Co. v. Lewis Rail Service Co., 10 F.3d 1247, 1251 (7th Cir. 1993) (finding that the insured had no reasonable excuse for delay, impleader would only delay and unnecessarily complicate the proceedings, and the insured retained the option of bringing a separate lawsuit).

We share IMI and Zurich's view that if Defendants had any objections to the dismissal of the insurers (then co-defendants), they should have interposed them at the time, rather than belatedly, at this late juncture, seek to implead them back into this litigation.  (See Order at 2-3, Docket No. 359).  We simply will not countenance further delay in resolving this case by permitting the excess insurers who were previously co-defendants but are no longer to be brought back into this dispute.  Impleading the additional insurers at this point would expand and complicate the resolution of this case for no good reason.  In contrast, Ohio Casualty will suffer little, if any, prejudice if it is forced to pursue its claims for contribution or indemnification in a separate action.  Our determinations here relating to coverage under the terms of Ohio Casualty's and American National's policies can easily be applied in any such independent indemnity/contribution action.  For these reasons, this motion, Docket No. 426, is DENIED.

<u>Conclusion</u>

In summary, IMI's Third Motion for Summary Judgment is <u>DENIED</u> [see Docket No. 321]; Defendants' Motion for Continuance of Summary Judgment Briefing pursuant to Rule 56(f) is <u>DENIED</u> [see Docket No. 340]; Defendants' Motion for Leave to File Third-Party Complaint for Indemnity or Contribution Against Northern Insurance Company, New Hampshire Insurance Company, Indemnity Insurance Company of North America, Travelers Property Casualty Company of America, Gulf Insurance Company, American Guarantee & Liability Insurance Company and National Surety Corporation is <u>DENIED</u> [see Docket No. 426]; Defendants' Motion for Leave to File an Amended Cross-Claim for Indemnity or Contribution, and for Bad Faith, Against Defendant Zurich American Insurance Company is <u>DENIED</u> [see Docket No. 427]; and, regarding IMI's Motion to Strike or, in the Alternative, Motion for Leave to File Reply, we <u>DENY</u> the motion to strike, and <u>GRANT</u> the motion to file reply [see Docket No. 481].  IT IS SO ORDERED.

Date:  ___03/30/2007___

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Gordon Dale Arnold
FREUND FREEZE & ARNOLD
garnold@ffalaw.com

58

Michael E. Brown
KIGHTLINGER & GRAY
mbrown@k-glaw.com

Janet Ruth Davis
MECKLER BULGER & TILSON
janet.davis@mbtlaw.com

Neil Frank Freund
FREUND FREEZE & ARNOLD
nfreund@ffalaw.com

James J. Hickey
MECKLER BULGER & TILSON
james.hickey@mbtlaw.com

Brent W. Huber
ICE MILLER LLP
brent.huber@icemiller.com

Eileen P. Huff
ICE MILLER LLP
eileen.huff@icemiller.com

Lindsay Noelle Marsico
FREUND FREEZE & ARNOLD
lmarsico@ffalaw.com

Steven D. Pearson
MECKLER BULGER & TILSON
steve.pearson@mbtlaw.com

Stephen J. Peters
HARRISON & MOBERLY
speters@h-mlaw.com

Ginny L. Peterson
KIGHTLINGER & GRAY
gpeterson@k-glaw.com

Rabeh M. A. Soofi
ICE MILLER LLP
rabeh.soofi@icemiller.com

Steven Edward Springer
KIGHTLINGER & GRAY
sspringer@k-glaw.com

Wayne Everett Waite
FREUND FREEZE & ARNOLD
wwaite@ffalaw.com

Robert W. Wright
DEAN-WEBSTER & WRIGHT LLP
rwright@dwwlegal.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com

Robert Wyn Young
FREUND FREEZE & ARNOLD
ryoung@ffalaw.com